UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------- X

NORTHWESTERN NATIONAL
INSURANCE COMPANY,

           **Plaintiff,**

   - against -

INSCO, LTD.,

           **Defendant.**

------------------------------------------------- X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  10/3/11
```

**OPINION AND ORDER**

**11 Civ. 1124 (SAS)**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.     INTRODUCTION

Northwestern National Insurance Company ("NNIC") and Insco, Ltd. ("Insco") are parties to a pending arbitration concerning disputes arising from a reinsurance agreement in effect between March 1, 1978, and April 1, 1979 (the "Agreement"). Before the Court is NNIC's motion to reopen this case and disqualify the law firm of Freeborn & Peters, LLP ("Freeborn") from representing Insco in the arbitration.

NNIC asserts (1) that issues of attorney disqualification are properly decided by the Court; and (2) that because of arbitration panel deliberations acquired by Freeborn, they must be disqualified from further representing Insco in

1

the arbitration.  Because Freeborn's behavior in the circumstances described below constituted a serious breach of its ethical duties and has tainted the arbitration proceedings, NNIC's motion is granted.

## II.   BACKGROUND

### A.   The Arbitration

In 1978, Insco and NNIC executed the Agreement whereby Insco agreed to reinsure a certain percentage of NNIC's liabilities in exchange for premium payments.[1]  The Agreement provided that any disputes arising between the parties should, upon written request of the parties, be submitted to arbitration.[2] In June 2009, NNIC commenced arbitration against Insco for amounts owed under the Agreement as well as interest and attorneys' fees.[3]  Pursuant to the Agreement, NNIC selected Diane Nergaard as its party appointee, Insco selected Dale Diamond as its party appointee, and an impartial umpire, Martin Haber, was

---

[1]   A brief background of the Agreement as well as certain important terms and conditions are set out in this Court's earlier opinion and order denying NNIC's February 18, 2011 Petition to Appoint an Arbitrator, and closing this case, *see Northwestern Nat'l Ins. Co. v. Insco, Ltd.*, No. 11 Civ. 1124, 2011 WL 1833303, at *1-2 (S.D.N.Y. May 12, 2011).

[2]   *See id.*

[3]   *See* 7/21/11 Declaration of Matthew C. Ferlazzo, counsel for NNIC, ("Ferlazzo Decl.") ¶ 2.

selected by lottery.[4]  Throughout these proceedings NNIC has been represented in both the arbitration and the related court matters by Barger & Wolen LLP ("Barger"), and Insco has been represented by Freeborn.

On February 2, 2010, the arbitration panel held an organizational meeting to discuss the case.[5]  At that meeting, the parties dealt with confidentiality issues, scheduling matters and other procedural issues.[6]  The parties agreed that they could communicate with their "party appointeds," however they could not discuss any issues relating to pending motions after those motions had been fully briefed and were pending before the panel.[7]  The panel also made disclosures to the parties about potential conflicts of interest, and they promised to continue to update their disclosures throughout the arbitration.[8]  By February 2011, there had been extensive motion practice before the panel,[9] as well as numerous interim orders

---

[4]      *See id.*

[5]      *See* 2/2/10 Organizational Meeting Transcript ("Org. Tr. I"), Ex. 1 to Ferlazzo Decl.

[6]      *See id.* at 13:1-20:25, 110:1-111:25.

[7]      *See id.* at 19:8-20:17.

[8]      *See* 8/22/11 Declaration of Robin C. Dusek, counsel for Insco, ("Dusek Decl.") ¶ 7.

[9]      *See* Ferlazzo Decl. ¶ 5.

3

issued by the panel.[10]

### B.   Freeborn Obtains Arbitration Panel Communications

In the Fall of 2010, Freeborn was informed by Insco's party appointee, Diamond, that he was concerned about Nergaard's close relationship with Barger and that "she was too dependent on Barger & Wolen as a source of business."[11]  Diamond continued to express such concerns to Freeborn through February 2011.[12]  In December 2010, Insco became aware of rumors that Nergaard had failed to disclose additional appointments by Barger to arbitration panels and other potential conflicts of interest.[13]  Upon Insco's request for updated disclosures, Nergaard disclosed multiple arbitration appointments, including two arbitration appointments by Barger that she had failed to disclose.[14]  At that point, Haber

---

[10]    *See, e.g.*, 1/11/11 Interim Order 8 and 1/28/11 Interim Order 9, Ex. D to 8/22/11 Declaration of Catherine A. Miller, counsel for Insco ("Miller Decl.").

[11]    8/22/11 Declaration of Joseph T. McCullough IV, counsel for Insco, ("McCullough Decl.") ¶ 5.  As with almost every other point in this case, the parties vigorously dispute the nature and frequency of the communications that Nergaard had with Evan Smoak, an attorney at Barger, who represents NNIC in the arbitration.  *Contrast* McCullough Decl. ¶ 6 (Nergaard received "abusive calls" from Smoak) and Dusek Decl. ¶ 15 (Nergaard was "threatened" by Smoak) *with* 9/6/11 Declaration of Evan L. Smoak ¶¶ 5-6 (denying all allegations).

[12]    *See* McCullough Decl. ¶ 9.

[13]    *See id.* ¶ 7; Dusek Decl. ¶¶ 13-14.

[14]    *See* 12/10/10 5:04 p.m. E-mail "RE: Panel Disclosures," Ex. G to McCullough Decl.

informed the parties of additional disclosures and asserted that full disclosures had been made by the panel.[15]

On February 11, 2011, Diamond shared certain private e-mail communications among panel members with Freeborn because they had "bothered him for some time."[16]  Specifically, the e-mails concerned Nergaard's frustration with Insco and its attorneys "attacking" and "slandering" her about her additional arbitration appointments by Barger.[17]  The communications show that Nergaard was upset about Insco's challenge as to whether she could decide the "case fairly on the merits."[18]

On February 15, 2011, Insco sent a letter to the panel and NNIC demanding that all of the arbitrators resign immediately because of "evident partiality."[19]  Diamond immediately resigned informing the panel that (1) he did not want NNIC to have a basis to appeal the panel's final ruling because of any

---

[15]    *See* 12/11/10 1:10 p.m. E-mail "Updated Disclosures-NNIC v Insco," Ex. I to McCullough Decl.

[16]    McCullough Decl. ¶¶ 9-10.

[17]    *See* 12/10/10 10:51 p.m. E-mail "RE: Panel Disclosures," Ex. H to McCullough Decl.

[18]    12/10/10 11:53 p.m. E-mail "Re: Panel Disclosures," Ex. H to McCullough Decl.

[19]    2/15/11 Resignation Demand, Ex. 2 to Ferlazzo Decl.

alleged conflict of interest that Diamond had with Insco, and (2) he believed the hearing had been unfair and that "NNIC has successfully twisted the entire arbitration process."[20]  Insco then asked the panel to (1) preserve all communications "regarding this arbitration," and (2) turn over any communications that Nergaard had with Barger, NNIC or any third party.[21] Subsequently, Joseph McCullough, an attorney at Freeborn, spoke to Diamond who "volunteered to provide documents he said would demonstrate that Ms. Nergaard was under the control of NNIC and its counsel."[22]  McCullough agreed, and Diamond turned over to Freeborn 182 pages of panel e-mails, including approximately 130 e-mails (duplicates excluded) in total, approximately thirty of which were from Haber.[23]  Freeborn's attorneys personally reviewed all the information contained in the e-mails and shared them with Insco.[24] NNIC's attorneys expressed suspicion in February 2011 that Diamond had disclosed panel communications after receiving letters from Insco that referenced

---

[20]    2/15/11 Diamond Resignation Letter, Ex. J to McCullough Decl.

[21]    *See* 2/16/11 2:54 p.m. E-mail "RE: NNIC v. Insco," Ex. 3 to Ferlazzo Decl.

[22]    McCullough Decl. ¶ 11.

[23]    *See* Ferlazzo Decl. ¶¶ 24-25.

[24]    *See* McCullough Decl. ¶ 12.

these panel discussions.[25]  Insco did not directly address NNIC's concern at the

time, but engaged in a flurry of communications accusing Nergaard of partiality

and demanding further disclosures as well as her resignation based on numerous

undisclosed conflicts of interest pursuant to accepted American Arbitration

Association ("AAA") and AIDA Reinsurance and Insurance Arbitration Society

("ARIAS") rules, guidelines and procedures.[26]

### C.    The Dispute Concerning the Panel Discussions

NNIC first learned conclusively that Insco was in possession of

private panel e-mails when Insco attached them as an exhibit to a declaration

submitted to this Court on March 4, 2011, in reference to NNIC's previously

mentioned February 18, 2011 Petition to Appoint an Arbitrator.[27]  NNIC

immediately contacted Insco, and its counsel Freeborn, informing them that NNIC

was seriously concerned upon discovering that Insco had such e-mails, and

questioning Insco regarding how and when Insco got the e-mails, how many they

---

[25]    *See* 2/17/11 2:55 p.m. E-mail "RE: Nergaard Disclosures," Ex. 4 to Ferlazzo Decl.; 2/22/11 3:54 p.m. E-mail "RE: NNIC v. Insco," Ex. 4 to Ferlazzo Decl.

[26]    *See, e.g.*, 2/17/11 8:26 a.m. E-mail "Disclosures," Ex. 4 to Ferlazzo Decl.; 2/17/11 10:02 p.m. E-mail "RE: NNIC v. Insco," Ex. 4 to Ferlazzo Decl.

[27]    *See* Ferlazzo Decl. ¶ 15; 3/9/11 4:54 p.m. E-mail "RE: NNIC/Insco–Insco's Improper Possession and Use of Panel Communications," Ex. 5 to Ferlazzo Decl.

had in their possession and other details about the e-mails.[28]  Insco treated these questions as "akin to discovery requests" and did not provide any useful information about the e-mails.[29]  Insco further asserted that they were entitled to possess these e-mails because they were evidence of "unethical behavior" by a panel member.[30]

At this Court's pre-motion conference before the filing of NNIC's Petition to Appoint an Arbitrator, Insco asserted that it intended to file a cross-motion to challenge Haber and Nergaard as impartial arbitrators after they failed to resign.[31]  Ultimately, Insco did not file this cross-motion after being told by the Court that it could not entertain an attack upon the qualifications of the arbitrators until after the conclusion of the arbitration.[32]  After this Court denied NNIC's petition to have the Court appoint a replacement for Diamond, Insco appointed

---

[28]     *See* 3/9/11 4:54 p.m. E-mail "RE: NNIC/Insco–Insco's Improper Possession and Use of Panel Communications."

[29]     *See* Dusek Decl. ¶ 23; 3/11/11 2:55 p.m. E-mail "RE: NNIC/Insco–Insco's Improper Possession and Use of Panel Communications," Ex. 5 to Ferlazzo Decl., also included as Ex. N to Dusek Decl.

[30]     *See* 3/11/11 2:55 p.m. E-mail "RE: NNIC/Insco–Insco's Improper Possession and Use of Panel Communications."

[31]     *See* 3/15/11 Conference Transcript at 2:21-3:21.

[32]     *See id*. at 4:12-20.

Jonathon Rosen as its new party appointee in place of Diamond.[33]

At the next organizational meeting before the arbitration panel in June, Insco continued to complain about Nergaard's failure to make certain disclosures[34] and NNIC demanded that Insco produce the communications it received from Diamond.[35]   Haber agreed with NNIC that Diamond's production of documents to Insco constituted a "massive violation," and Insco agreed to produce the documents.[36]   Insco, through its entire team of attorneys, asserts that none of the e-mails in question contain any information that is relevant to the merits of the arbitration proceeding.[37]

On June 28, Insco provided NNIC with the full 182-page document that it received from Diamond.[38]   Because the document contained many e-mails exchanged solely among panel members, NNIC hired outside counsel, Daniel FitzMaurice of the law firm Day Pitney, who had never worked on the present

---

[33]     *See* Dusek Decl. ¶ 19.

[34]     *See* 6/15/11 Organizational Meeting Transcript ("Org. Tr. II"), Ex. 1 to Ferlazzo Decl. at 17:13-20:24.

[35]     *See id.* at 154:17-156:25.

[36]     *See id.* at 156:20-25.

[37]     *See* Miller Decl. ¶¶ 9-10; Dusek Decl. ¶ 18; McCullough Decl. ¶ 12; 8/22/11 Declaration of Kerry E. Slade, counsel for Insco, ¶¶ 3-5.

[38]     *See* Ferlazzo Decl. ¶ 20.

arbitration, to review the e-mails.[39]  NNIC's attorneys did not personally review the

e-mails.[40]  FitzMaurice reviewed all of the e-mail communications and compiled a

chart of every e-mail in the document, noting its time, sender, recipient and a brief

summary of the content.[41]  NNIC strenuously asserts that the content summaries on

the Chart suggest that many of the e-mails relate to issues that were or are still

pending in the arbitration.[42]  NNIC further claims that when Insco used some of the

panel e-mails as an exhibit to a declaration submitted concerning the February 18,

2011 Petition to Appoint an Arbitrator, it did not disclose additional e-mails from

Nergaard in the same e-mail chain, and that Insco changed the appearance of

certain e-mails.[43]  Insco fervently denies this allegation, claiming that the e-mails it

presented were authentic and complete.[44]

### D.  The Panel's Response and the Present Action

---

[39]     *See id.* ¶ 24.

[40]     *See* 9/6/11 Reply Declaration of Matthew C. Ferlazzo ("Ferlazzo Reply Decl.") ¶¶ 9-16.  Insco maintains, however, that it "appeared" that NNIC had reviewed "at least a portion of the e-mails," *see* McCullough Decl. ¶ 14.

[41]     *See* 7/21/11 Panel E-mail Chart, Exs. 1 and 2 to 7/21/11 Declaration of Daniel L. FitzMaurice, outside counsel from Day Pitney (collectively, the "Chart").

[42]     *See* Ferlazzo Decl. ¶¶ 25-33.

[43]     *See id.* at ¶¶ 40-43; *see also* Ferlazzo Reply Decl. ¶¶ 2-8.

[44]     *See* Dusek Decl. ¶¶ 21-22.

On June 30, 2011, in response to NNIC's complaints about the e-mail disclosures, the panel issued Interim Order 12.[45]  In its Order, the panel noted that the "release by Mr. Diamond of intra-panel communications was highly inappropriate," but that "[n]evertheless, this Panel will continue to decide the case on the facts and evidence presented."[46]  The panel further noted that "this action by Mr. Diamond [] struck at the heart of the arbitral process in that the deliberations among the Panel are solely for the Panel's use and no one else."[47]  While the panel determined that it would continue with the hearing anyway, it ordered that (1) all documents, electronic or printed, that came from Diamond's disclosure "be destroyed within 10 calender days and that no copies be retained by either party," and (2) "no document released by Mr. Diamond be used in any brief, motion or other writing or argument . . . presented to this Panel."[48]

The Order further provided, somewhat ambiguously, that ten days would provide enough time for the parties to destroy the documents "or make

---

[45]     *See* 6/30/11 Interim Order 12, Ex. 7 to Ferlazzo Decl., also attached as Ex. L to McCullough Decl.

[46]     *Id.*

[47]     *Id.*

[48]     *Id.*

11

appropriate motions before a court."[49]  NNIC suggests that this phrase

contemplates a wide variety of motions, such as the present one to disqualify

counsel.[50]  Insco, however, believes that this clause was limited to "an opportunity

to ask a court for relief from Interim Order 12's requirement that they destroy the

documents."[51]  Insco complied with the Order by destroying all of its copies of the

confidential communications.[52]  Subsequent to Interim Order 12, however, NNIC

informed all parties that it was considering taking action in court, and continued to

question Insco about the content of specific e-mails.[53]  Insco asserted that it could

no longer answer NNIC's questions because it had destroyed the e-mails pursuant

to Interim Order 12.[54]  NNIC countered that this constituted illicit obstruction of a

legal proceeding because the panel had specifically allowed the parties time to

---

[49]    *Id.*

[50]    *See* Petitioner's Memorandum of Law in Support of Its Motion to Disqualify Insco's Counsel ("Pl. Mem.") at 23.

[51]    Dusek Decl. ¶ 29.

[52]    *See* McCullough Decl. ¶ 17; 7/18/11 10:50 a.m. E-mail "NNIC v. Insco - Interim Order #12," Ex. O to Dusek Decl.

[53]    *See* 7/7/11 3:38 p.m. E-mail "NNIC/Insco–Interim Order 12," Ex. 8 to Ferlazzo Decl.; 7/15/11 6:49 p.m. E-mail "NNIC/Insco–Insco's Improper Possession of Panel Deliberations," Ex. 9 to Ferlazzo Decl.

[54]    *See* 7/18/11 11:29 a.m. E-mail "RE: NNIC/Insco–Insco's Improper Possession of Panel Deliberations and Refusal to Answer Questions About Their Misconduct," Ex. 9 to Ferlazzo Decl.

12

make motions in court.[55]

On June 30, 2011, the parties argued their summary judgment motion before the panel.[56]  NNIC's motion was denied by a written order dated July 19, 2011.[57]  On July 21, 2011, NNIC moved this Court to reopen this case and disqualify Freeborn from further representing Insco in the arbitration because of their actions in obtaining the panel discussion e-mails from Diamond, and their failure, for months, to fully disclose the documentation they had acquired.  As part of its opposition papers to this motion, Freeborn submitted a copy of the Chart prepared by FitzMaurice containing an additional "Response" column where Freeborn explains why no e-mail in the document bears upon the merits or pending proceedings of the arbitration.[58]  In addition, both Insco and NNIC have submitted portions of the 182-page panel communications disclosure for this Court's review.[59]

---

[55]     *See* Pl. Mem. at 23.

[56]     *See* McCullough Decl. ¶ 17.

[57]     *See* 7/19/11 Interim Order 17 NNIC's Motion for Summary Judgment, Ex. M to McCullough Decl.

[58]     *See* 8/22/11 Revised Panel E-mail Chart, Exs. A and B to Miller Decl.

[59]     *See* Selected Freeborn E-mails, Exs. C, E and F to Miller Decl.; Selected Freeborn E-mails, Exs. 1 and 2 to 9/6/11 Reply Declaration of Daniel L. FitzMaurice (filed under seal).

## III.    APPLICABLE LAW

### A.    Arbitrability

"The Supreme Court has 'distinguished between 'questions of arbitrability,' which are to be resolved by the courts unless the parties have clearly agreed otherwise, and other 'gateway matters,' which are presumptively reserved for the arbitrator's resolution."[60]  "[M]atters of attorney discipline are beyond the jurisdiction of arbitrators . . . .  Issues of attorney disqualification . . . cannot be left to the determination of arbitrators selected by the parties themselves for their expertise in the particular industries engaged in."[61]  "[I]ssues of a lawyer's professional responsibilities [are] not within the customary expertise of [] industry arbitrators" and are "appropriately decided by the Court."[62]  It is now settled that "'possible attorney disqualification [] is not capable of settlement by

---

[60]    *Republic of Ecuador v. Chevron Corp.*, 638 F.3d 384, 393 (2d Cir. 2011) (quoting *Mulvaney Mech., Inc. v. Sheet Metal Workers Int'l Ass'n, Local 38*, 351 F.3d 43, 45 (2d Cir. 2003) (quoting *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83-85 (2002))).

[61]    *Bidermann Indus. Licensing, Inc. v. Avmar N.V.*, 570 N.Y.S.2d 33, 34 (1st Dep't 1991) (citations omitted).

[62]    *Employers Ins. Co. of Wausau v. Munich Reins. Am., Inc.*, No. 10 Civ. 3558, 2011 WL 1873123, at *2 (S.D.N.Y. May 16, 2011).

arbitration.'"[63]

### B.     Attorney Disqualification

"Whether to disqualify counsel is a matter subject to the trial court's sound discretion . . . .  However, there is a general aversion to motions to disqualify in the Second Circuit."[64]  "While it is within the discretion of the Court to disqualify an attorney . . . a party seeking to disqualify an opponent party's counsel generally faces a high burden of proof in doing so."[65]

> This reluctance to disqualify results from two factors.  First, disqualification separates the client from his counsel of choice. Second, motions to disqualify are often tactically motivated; they cause delay and add expense; they disrupt attorney-client relationships sometimes of long standing; in short, they tend to derail the efficient progress of litigation.  Thus parties moving for disqualification of counsel carry a heavy burden and must satisfy a high standard of proof to succeed on the motion.  However, the Second Circuit counsels that any doubts that exist should be

---

[63]     *Munich Reins. Am., Inc. v. ACE Prop. & Cas. Ins. Co.,* 500 F. Supp. 2d 272, 275 (S.D.N.Y. 2007) (quoting *In Matter of Arbitration Between R3 Aerospace Inc. and Marshall of Cambridge Aerospace Ltd.*, 927 F. Supp. 121, 123 (S.D.N.Y. 1996)).  *Accord Gordon v. Skylink Aviation, Inc.*, 28 Misc.3d 1235(A) (Sup. Ct. N.Y. Co. 2010).

[64]     *Feinberg v. Katz*, No. 01 Civ. 2739, 2003 WL 260571, at *3 (S.D.N.Y. Feb. 5, 2003) (quotation marks and citations omitted).

[65]     *Miness v. Ahuja*, 713 F. Supp. 2d 161, 166 (E.D.N.Y. 2010) (citing *Purgess v. Sharrock*, 33 F.3d 134, 144 (2d Cir. 1994) and *Glueck v. Jonathan Logan, Inc.*, 653 F.2d 746, 748 (2d Cir. 1981)).

resolved in favor of disqualification.[66]

"The disqualification of an attorney in order to forestall violation of ethical principles is a matter committed to the sound discretion of the district court."[67]  "The authority of federal courts to disqualify attorneys derives from their inherent power to 'preserve the integrity of the adversary process.'"[68]  "[T]he courts have not only the supervisory power but also the duty and responsibility to disqualify counsel for unethical conduct prejudicial to his adversaries."[69]  "A trial judge is required to take measures against unethical conduct occurring in connection with any proceeding before [her]."[70]  "A party seeking disqualification of an attorney based on the disclosure of confidential information previously made

---

[66]    *Feinberg*, 2003 WL 260571, at *3 (quotation marks and citations omitted).

[67]    *Cresswell v. Sullivan & Cromwell*, 922 F.2d 60, 72 (2d Cir. 1990).

[68]    *Hempstead Video, Inc. v. Incorporated Vill. of Valley Stream*, 409 F.3d 127, 132 (2d Cir. 2005) (quoting *Board of Educ. of N.Y. v. Nyquist*, 590 F.2d 1241, 1246 (2d Cir. 1979).  *Accord Hull v. Celanese Corp.*, 513 F.2d 568, 571 (2d Cir. 1975) ("The district court bears the responsibility for the supervision of the members of its bar.").

[69]    *Ceramco, Inc. v. Lee Pharm.*, 510 F.2d 268, 271 (2d Cir. 1975).

[70]    *Gentner v. Shulman*, 55 F.3d 87, 89 (2d Cir. 1995).  *Accord Lelsz v. Kavanagh*, 137 F.R.D. 646, 655-56 (N.D. Tex. 1991) ("There is no question that the Court possesses the authority to remove an attorney from a case pursuant to its inherent power to regulate the conduct of attorneys practicing before it.") (collecting cases).

16

to the attorney, usually in [the] course of previous representation, has the burden of identifying the specific confidential information imparted to the attorney."[71]

"[D]isqualification is warranted," however, "if 'an attorney's conduct tends to taint the underlying trial.'"[72]

## IV.   DISCUSSION

### A.   This Court Must Decide the Motion for Disqualification

Insco argues, as an initial matter, that this Court should refuse to entertain the present motion and instead, let "the arbitration panel decide, in the first instance, whether the information contained in the e-mails at issue is in any way problematic for that proceeding to continue with the parties represented by current counsel."[73]   While it is indeed true that the Federal Arbitration Act[74] ("FAA") represents a "liberal federal policy favoring arbitration,"[75] the Court

---

[71]   *Muriel Siebert & Co., Inc. v. Intuit Inc.*, 820 N.Y.S.2d 54, 55 (1st Dep't 2006) (quotation marks and citations omitted).

[72]   *Canal+ Image UK Ltd. v. Lutvak*, No. 10 Civ. 1536, 2011 WL 2396961, at *9 (S.D.N.Y. June 8, 2011) (quoting *GSI Commerce Solutions, Inc. v. BabyCenter, LLC*, 618 F.3d 204, 209 (2d Cir. 2010)).

[73]   Insco's Opposition to Petitioner's Motion to Disqualify ("Def. Mem.") at 10-11.

[74]   9 U.S.C. § 1, *et seq.*

[75]   *AT&T Mobility LLC v. Concepcion*, – U.S. –, 131 S. Ct. 1740, 1745 (2011) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)).

continues to play a central role in issues involving attorney disqualification.[76]  In addition to the fact that Insco fails to cite any relevant precedent for leaving this matter to the arbitration panel, there are two compelling reasons here for the Court to entertain this motion:  (1) Courts, rather than insurance industry experts, decide issues of attorney discipline, and (2) the panel in this case has already indicated that it is not interested in considering this matter.[77]

### 1.    Attorney Disqualification Is a Matter for the Court

Attorney disqualification is "a substantive matter for the courts and not arbitrators" for the simple reason that "it requires an application of substantive state law regarding the legal profession."[78]  In other words, arbitrators are selected by parties to a dispute primarily for their "expertise in the particular industries engaged in" and cannot be expected to be familiar with the standards of conduct applicable to the legal profession.[79]  I also note that in this action, the attorneys played a significant role in selecting their parties' respective party appointed arbitrators — a fact that further casts doubt on the ability of the arbitration panel to

---

[76]    *See Munich Reins.,* 500 F. Supp. 2d at 275.

[77]    *See* Org. Tr. II at 155:16-156:25.

[78]    *Munich Reins.,* 500 F. Supp. 2d at 275.

[79]    *Bidermann*, 570 N.Y.S.2d at 34.

18

consider a motion to disqualify counsel.  Moreover, the alleged wrongful conduct arose out of accusations of bias against one of the arbitrators.  It is therefore appropriate for the Court to follow established New York precedent and consider this motion to disqualify Freeborn from representing Insco in the arbitration.

### 2.    The Panel Has Refused to Consider This Matter

Even if the panel were competent to resolve this matter, it has explicitly refused to do so in the present case.  In the second arbitration organizational meeting on June 15, where the issue of the released documents was brought to the panel's attention, the panel refused to address it.  Other than ordering disclosure, the panel simply stated "it's not really a panel issue," and "[i]t's not this Panel's issue because I would have to become embroiled in any of that and I avoid that whole circumstance because I go forward in life. I don't go backwards."[80]  Later, at the arbitration hearing for summary judgment on June 30, the panel further stated regarding the e-mails, "Counsel, this is the Panel's order [Interim Order 12] and if you believe you have legal rights that you need to have enforced, you know where to get them enforced.  We don't want this to go any further before us."[81]  Moreover, in the panel's formal written response to

---

[80]    Org. Tr. II at 155:16-156:25.

[81]    6/30/11 Opening Arguments Transcript, Ex. 1 to Ferlazzo Decl., at 13:6-10.

Freeborn's actions in obtaining the e-mails, Interim Order 12, the panel noted that it had not investigated the entire situation, and "[t]he Panel notes that the communications at issue were only part of the deliberative process" and "we do not know whether every writing among the Panel was delivered."[82]  The panel also included a reference to the parties' abilities to "make appropriate motions before a court."[83]  It is thus clear that the panel was either unable or uninterested in fully dealing with the e-mail disclosure and its consequences.  The panel here did not fully address the factual record related to the improperly disclosed e-mails nor did it consider the legal question of whether disqualification was warranted.  It would, therefore, be manifestly unfair for this Court to refuse to at least consider NNIC's motion to disqualify Freeborn.

### B.   Freeborn's Actions Constituted a Serious Breach of Its Ethical Duties

Freeborn's actions in obtaining and hiding panel deliberations in an ongoing arbitration constituted a serious violation of arbitral guidelines, as well as ethical rules.  While not considered binding law upon the parties, Comment Three to the ARIAS Code of Conduct, Canon VI, states that "[i]t is not proper at any time for arbitrators to . . . inform anyone concerning the contents of the deliberations of

---

[82]     Interim Order 12.

[83]     *Id.*

20

the arbitrators."[84]  The ARIAS Ethics Guidelines further state that "[a]n arbitrator should not reveal the deliberations of the Panel. To the extent an arbitrator predicts or speculates as to how an issue might be viewed by the Panel, the arbitrator should at no time repeat statements made by any member of the Panel in deliberations, even his or her own."[85]  Likewise, the American Bar Association's Code of Ethics for Arbitrators in Commercial Disputes, prepared in conjunction with the AAA, states that "[i]n a proceeding in which there is more than one arbitrator, it is not proper at any time for an arbitrator to inform anyone about the substance of the deliberations of the arbitrators."[86]

Despite Insco's intimation that the present arbitration was not governed by ARIAS or AAA rules and guidelines,[87] Insco's attempts to rely on ARIAS and AAA guidelines so frequently throughout the arbitration proceedings

---

[84]     ARIAS Code of Conduct, Ex. 10 to Ferlazzo Decl., *available at* http://www.arias-us.org/index.cfm?a=32.

[85]     ARIAS Additional Ethics Guidelines, Ex. 10 to Ferlazzo Decl., *available at* http://www.arias-us.org/index.cfm?a=384.

[86]     American Bar Association's Code of Ethics for Arbitrators in Commercial Disputes, Canon VI(c), Ex. 10 to Ferlazzo Decl., *available at* http://www.americanbar.org/content/dam/aba/migrated/dispute/commercial_disput es.authcheckdam.pdf.

[87]     *See* McCullough Decl. ¶ 4.

render this argument incredible.[88]  Moreover, the New York State Rules of Professional Conduct state that a "lawyer or law firm shall not . . . engage in conduct involving dishonesty, fraud, deceit or misrepresentation; . . . engage in conduct that is prejudicial to the administration of justice."[89]  I fully agree with the panel's findings in Interim Order 12 that Insco's conduct was inappropriate and that it was a violation of the New York State Rules of Professional Conduct, as well as multiple non-binding arbitration guidelines referred to previously.  There is also no question that this Court is authorized to impose sanctions on attorneys "found to have engaged in conduct violative of the New York State Rules of Professional Conduct as adopted from time to time by the Appellate Divisions of the State of New York."[90]

### 1.   Insco's Allegations of Bias Do Not Justify Its Actions

Insco attempts to defend its actions by arguing that (1) there is nothing problematic about *ex parte* communications with a party appointee to an arbitration panel, and (2) the e-mails that Insco obtained were legitimately discoverable for

---

[88]   *See, e.g.*, Resignation Demand; 2/17/11 8:26 a.m. E-mail "Disclosures," Ex. 4 to Ferlazzo Decl.; 2/17/11 10:02 p.m. E-mail "RE: NNIC v. Insco," Ex. 4 to Ferlazzo Decl.

[89]   22 N.Y.C.R.R. § 1200.00 R. 8.4(c)-(d).

[90]   Loc. Civ. R. 1.5(b)(5).

the purpose of proving Nergaard's lack of impartiality.[91]  While the parties in the present action certainly contemplated that they could and would communicate with their party-appointed arbitrators,[92] in light of the ethical arbitration guidelines noted above and the conclusion of Interim Order 12, this authority cannot be construed to extend to the sharing of actual panel deliberations and communications.  I understand and appreciate that "ex parte feedback from party-appointed arbitrators regarding the arbitration panel's view of the facts and issues can help the parties narrow the issues in dispute, focus on the evidence and arguments the arbitrators are most interested in, and reach a negotiated settlement."[93]  However, leaking private communications among the arbitrators that may contain sensitive deliberations on disputed matters goes beyond the salutory purpose of expediting the arbitration and has a strong tendency to taint arbitral proceedings.

Furthermore, Insco's actions cannot be justified by its allegations of Nergaard's lack of impartiality.  Although the FAA allows a court to vacate an arbitration award — after it has been rendered — "where there was evident

---

[91]     *See* Def. Mem. at 12-15.

[92]     *See* Org. Tr. I at 19:8-20:18.

[93]     McCullough Decl. ¶ 3.

23

partiality or corruption in the arbitrators,"[94] the Second Circuit has set a very high

standard for vacatur, and it will only be granted where "a reasonable person,

considering all of the circumstances, 'would *have* to conclude' that an arbitrator

was partial to one side."[95]   More importantly, though, a party is never allowed to

probe the decision-making process of an arbitration panel to prove bias, except in

the most egregious of cases.[96]   In fact, "[p]ost-verdict examinations of a judicial or

quasi-judicial officer, be he judge, juror, or arbitrator, for the purpose of

impeaching his decision, are inherently suspect, indeed, roundly condemned, in our

system of jurisprudence."[97]   In this case, Insco's suspicions concerning Nergaard

---

[94]     9 U.S.C. § 10.

[95]     *Applied Indus. Materials Corp. v. Ovalar Makine Ticaret Ve Sanayi, A.S.*, 492 F.3d 132, 137 (2d Cir. 2007) (quoting *Morelite Constr. Corp. v. New York City Dist. Council Carpenters Benefit Funds*, 748 F.2d 79, 84 (2d Cir. 1984)) (emphasis in original).  *Accord Sofia Shipping Co., Ltd. v. Amoco Transp. Co.*, 628 F. Supp. 116, 119 (S.D.N.Y. 1986) ("Courts are reluctant to set aside an award based on a claim of evident partiality, and will do so only if the bias of the arbitrator is direct and definite; mere speculation is not enough.").

[96]     *See Petition of Fertilizantes Fosfatados Mexicanos, S.A.*, 751 F. Supp. 467, 468 n.1 (S.D.N.Y. 1990) ("This case should not be viewed as a precedent in any way for inquiry into the deliberations of an arbitration panel. Such matters should remain confidential and inviolate. The only reason it was permitted here was because of the seriousness of the charges made by the dissenter against the other two arbitrators."); *see also Matter of Arbitration Between Advest, Inc. and Asseoff*, No. 92 Civ. 2269, 1993 WL 119690, at *3 (S.D.N.Y. Apr. 14, 1993).

[97]     *Reichman v. Creative Real Estate Consultants, Inc.*, 476 F. Supp. 1276, 1286 (S.D.N.Y. 1979).  *Accord Rubens v. Mason*, 387 F.3d 183, 191 (2d Cir.

related to failures to disclose appointments in other arbitrations and other personal conflicts of interest.  Such allegations are distinguishable from serious allegations of negligence or malfeasance in the pending arbitration.

Insco's argument that the prohibition on probing panel deliberations is limited to "*admitting evidence . . . in subsequent legal proceedings*"[98] also fails to justify its conduct in this case.  "While arbitrators may be deposed regarding claims of bias or prejudice, cases are legion in which courts have refused to permit parties to depose arbitrators — or other judicial or quasi-judicial decision-makers — regarding the thought processes underlying their decisions."[99]  The information that Insco obtained here went well beyond inquiries into the potential bias of an arbitrator, and included the receipt of a large number of private panel communications.  The communications relate to a number of issues, and at least some relate to the arbitrators' thought processes in the proceeding.  Even the cases relied upon by Insco make clear that vacature of an award is warranted where

---

2004).

[98]     Def. Mem. at 14 (emphasis in original).

[99]     *Hoeft v. MVL Group, Inc.*, 343 F.3d 57, 67 (2d Cir. 2003), *overruled on other grounds as stated in ATSI Commc'ns, Inc. v. Shaar Fund, Ltd*, 547 F.3d 109, 115 (2d Cir. 2008).

25

parties obtained information relating to the merits of the dispute.[100]  It was, therefore, inappropriate for Insco to obtain panel deliberations before the close of the arbitration, and in violation of arbitration guidelines.  Especially in light of the fact that Insco had already asked the panel to preserve all internal communications,[101] there was no need for Insco to obtain and review internal communications while the matter was still pending.  Finally, and in any event, even if Insco felt it could later mount legitimate attacks on Nergaard's impartiality, it was "not proper at any time for arbitrators to . . . assist a party in post-arbitral proceedings, except as is required by law."[102]

The Court also finds no merit or appeal in Insco's counter-arguments that (1) NNIC improperly and strategically delayed making this motion until after the panel's denial of summary judgment even though they learned of the e-mails in February or March, and (2) that NNIC's attorneys could have simply read the e-mails themselves in order to level the playing field.[103]  *First*, Insco cannot complain about the timing of the present motion, when it failed to disclose exactly what

---

[100]     *See, e.g.*, *Prozina Shipping Co. Ltd. v. Elizabeth-Newark Shipping, Inc.*, No. 98 Civ. 5834, 1999 WL 705545, at *5 (S.D.N.Y. Sept. 10, 1999).

[101]     *See* 2/16/11 2:54 p.m. E-mail "RE: NNIC v. Insco."

[102]     ARIAS Code of Conduct, Canon VI, comment 3.

[103]     *See* Def. Mem. at 7, 17.

information was in its possession until after the June 15 organizational meeting.

*Second*, NNIC cannot be faulted for refraining from reading 182 pages of e-mails

exchanged among the panel members.  NNIC was under no obligation to take the

same inappropriate actions as Insco did and review documents identified as panel

communications.

C.   **The E-mails Obtained by Insco Contain Substantive Discussions About the Underlying Proceedings**

NNIC argues that the ethical lapses outlined above require that

Freeborn be disqualified from further representing Insco in this matter.  While

attorney disqualification is a "drastic measure,"[104] when faced with questions of

disqualification, "any doubt is to be resolved in favor of disqualification."[105]  The

Court's mandate to protect the integrity of the adversary process is not limited to

cases involving the compromise of an attorney's loyalty to a current or former

client.[106]  Disqualification is warranted when the violations alleged "'pose[] a

---

[104]   *Capponi v. Murphy*, 772 F. Supp. 2d 457, 471 (S.D.N.Y. 2009). *Accord Scantek Med., Inc. v. Sabella*, 693 F. Supp. 2d 235, 238-39 (S.D.N.Y. 2008) (collecting cases).

[105]   *Sea Trade Maritime Corp. v. Coutsodontis*, No. 09 Civ. 488, 2011 WL 3251500, at *6 (S.D.N.Y. July 25, 2011) (citing *Hull*, 513 F.2d at 571).

[106]   *Matter of Beiny*, 517 N.Y.S.2d 474, 484 (1st Dep't 1987).

27

significant risk of trial taint.'"[107]

NNIC points to numerous instances of specific communications between Freeborn and Diamond that raise a serious risk of tainting the underlying proceedings including:  (1) e-mail 9[108] pertains to a draft of what became Interim Order 9; (2) e-mails 64-67 involved communications between Freeborn and Diamond in which Freeborn provided Diamond with a one-sided view of certain discovery issues which Diamond then forwarded to the full panel; (3) e-mails 52, 111, 238, and 253 pertain to drafts of what were to become Interim Orders 8, 9 and 11.  Freeborn had these e-mails in February 2011 at the latest, and Order 11 was not issued until July 7, 2011; (4) e-mail 52 also pertains to discovery issues pending before the panel while discovery disputes were still ongoing in the arbitration; (5) e-mail 145 pertains to the location of certain depositions still at issue in the arbitration.  The parties had ongoing disputes about the location of

---

[107]    *Decker v. Nagel Rice LLC*, 716 F. Supp. 2d 228, 231 (S.D.N.Y. 2010) (quoting *Glueck*, 653 F.2d at 748).  *Accord Medical Diagnostic Imaging, PLLC v. CareCore Nat'l, LLC*, 542 F. Supp. 2d 296, 306 (S.D.N.Y. 2008).

[108]    Specific e-mails from Diamond's disclosure are referred to based on their numerical position in the Chart prepared by FitzMaurice.  While McCullough does not mention any e-mails sent to him by Diamond before February 11, *see* McCullough Decl. ¶ 9, the Chart contains e-mail chains that were forwarded to McCullough in January as well.  Moreover, as noted in the footnotes to the Reply Declaration of FitzMaurice, it is unclear exactly how early some of the e-mail chains were forwarded to McCullough.

depositions; (6) e-mail 170 pertains to choice of law issues which were later the subjects of complaints; (7) e-mail 212 contains Haber's views about the timing of depositions, summary judgement and the audit report.  This e-mail was in Freeborn's possession by February 2011, and arguments on summary judgement did not occur until June; and (8) e-mail 238 contains Haber's views about depositions, some of which were still pending.[109]  Because many of these e-mails relate to actual and ongoing disputes in the arbitration, disqualification of Freeborn is warranted.

While Insco argues that none of the panel communications at issue are important to or tend to taint the arbitration, there is little support for this argument. Although, for example, Insco denies that e-mail 9 contains a draft order, it appears to admit that the e-mail "concerned" an unissued scheduling order and that it received the e-mail before the order was issued.[110]  Insco quotes a portion of e-mail 52 — a paragraph concerning accountability and attorneys' fees — to show that it does not constitute deliberations.[111]  However, that e-mail, as well as the long chain of e-mails of which it is a part, contain extended discussions by the panel

---

[109]   *See* Pl. Mem. at 9-10; Ferlazzo Decl. ¶¶ 26-33.

[110]   *See* Def. Mem. at 17.

[111]   *See id.* at 18.

concerning discovery issues, as well as the proposed text of a discovery order.[112]
Moreover, these e-mails were mostly sent on February 10 and 11, and were
forwarded to Freeborn a few days later on February 17. Both parties agree that
discovery has been a hotly contentious topic in the arbitration proceedings, and that
disputes were ongoing in February 2011. Likewise, while e-mail 145 may be
limited to a draft order regarding the location of depositions that was finalized
before the e-mail was disclosed to Freeborn, the subsequent e-mails in the chain
also contain substantive discussions, including panel members' opinions.[113] Also,
despite the fact that the e-mail shows that Nergaard contemplated certain panel e-
mails being shared with the parties, she specifically asked that this not take place
until the pending issue was resolved.[114]

      Furthermore, although Insco disputes that e-mail 170 contains
substantive discussions about choice of law, the e-mail does contain discussions
about issues that could arise regarding choice of law.[115] E-mail 170 is also part of a

---

[112]    *See* E-mails 40-62, Ex. E to Miller Decl.

[113]    *See* E-mails 140-145, Ex. C to Miller Decl.

[114]    *See* E-mail 142, Ex. C to Miller Decl. In e-mail 142, Nergaard
explicitly expressed concern that certain e-mails were shared prior to the panel's
resolution.

[115]    *See* E-mail 170, Ex. F to Miller Decl.

chain of multiple internal panel communications that include Haber soliciting other

panel members' views on issues about the location of depositions.[116]   Similarly,

Insco cites a portion of e-mail 212 to show that it contains no substantive views on

summary judgment.[117]   However, the debate about the production of audit reports

contained in the e-mail chain, including e-mail 212, was an important issue to the

parties, spanned several internal panel communications and affected the scheduling

of summary judgment.[118]   Finally, although Insco quotes only a sentence from e-

mail 238, that e-mail is part of a chain of over a dozen internal panel e-mails that

discuss discovery issues, as well as a draft order.[119]   Thus, Insco acted

inappropriately by obtaining e-mails that contained deliberations on live and

contested issues which were not meant to be shared with the parties.

   In sum, disclosure of the foregoing discussions tended to taint the

proceedings, and to the extent there is any doubt, it should be resolved in favor of

disqualification.   In an age in which electronic communications play a central role

in arbitrator deliberations, it is imperative that such communications remain as

---

[116] *See* E-mails 168-179.

[117] *See* Def. Mem. at 18.

[118] *See* E-mails 209-216, Ex. F to Miller Decl.

[119] *See* E-mail 238, Ex. F to Miller Decl.

protected as all other forms of private panel interactions.  Deliberate action to

obtain such records is a disservice to the integrity of the adversarial process, and is

strictly and unambiguously prohibited.  Allowing parties to obtain confidential

panel deliberations would provide an unfair advantage in the legal proceedings and

have a chilling effect on the ability of arbitrators to communicate freely.

## V.      CONCLUSION

For the foregoing reasons, plaintiff's motion to disqualify counsel

Freeborn from representing defendant Insco is granted.  The Clerk is directed to

close this motion [Docket No. 22] and this case is to remain closed.


SO ORDERED:

Shira A. Scheindlin
U.S.D.J.


Dated:       New York, New York
             October 3, 2011


32

**- Appearances -**

**For Plaintiff:**

Matthew Christian Ferlazzo, Esq.
Evan L. Smoak, Esq.
Barger and Wolen LLP
10 East 40th Street, 40th Floor
New York, NY 10016
(212) 557-2800/ 2884

Daniel L. FitzMaurice, Esq.
Matthew John Shiroma, Esq.
Day Pitney, L.L.P.
242 Trumbull Street
Hartford, CT 06103
(860) 275-0181/ 0217

**For Defendant:**

James J. Boland, Esq.
Robin C. Dusek, Esq.
Joseph T. McCullough , IV, Esq.
Catherine A. Miller, Esq.
Kerry Elizabeth Slade, Esq.
Freeborn & Peters LLP
311 South Wacker Drive
Suite 3000
Chicago, IL 60606
(312) 360-6000